**GLANCY PRONGAY & MURRAY LLP**
LIONEL Z. GLANCY (#134180)
ROBERT V. PRONGAY (#270796)
LESLEY F. PORTNOY (#304851)
CHARLES H. LINEHAN (#307439 )
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com

*Counsel for Plaintiff*
[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHRYN A. POSER, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>  v.<br><br>LIVE NATION ENTERTAINMENT, INC., MICHAEL J. RAPINO, JOE BERCHTOLD, and JARED SMITH,<br><br>    Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kathryn A. Poser ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Live Nation Entertainment, Inc. ("Live Nation" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Live Nation; and (c) review of other publicly available information concerning Live Nation.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of all persons and entities that purchased or otherwise acquired Live Nation common stock between February 23, 2017 and March 30, 2018, inclusive (the "Class Period").  Plaintiff pursues claims under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Live Nation produces live concerts and sells tickets to those events over the internet. The Company owns and operates over 195 venues throughout the world, and the Company significantly expanded its ticketing services with the purchase of Ticketmaster Entertainment ("Ticketmaster") in 2010.

3.      During the course of acquiring Ticketmaster, Live Nation agreed to the terms of an antitrust consent decree with the Department of Justice (the, "Consent Decree"). The Consent Decree contained specific rules to prevent the Company from monopolizing live music promotion and ticketing.

4.      On April 1, 2018, after the close of the market, The New York Times published a story entitled, "Roster of Stars Lets Live Nation Flex Ticket Muscles, Rivals Say." Therein, the article alleged that the Company failed to abide by the terms of the Consent Decree aimed to prevent Live Nation and Ticketmaster from monopolizing the market for live musical performances. The article stated in relevant part:

In 2010, when the Justice Department allowed the two most dominant companies in the live music business -- Live Nation and Ticketmaster -- to merge, many greeted the news with dread.

Live Nation was already the world's biggest concert promoter. Ticketmaster had for years been the leading ticket provider. Critics warned that the merger would create an industry monolith, one capable of crippling competitors in the ticketing business.

Federal officials tried to reassure the skeptics. They pointed to a consent decree, or legal settlement, they had negotiated as part of the merger approval. Its terms were strict, they said: It would boost competition and block monopolistic behavior by the new, larger Live Nation.

***

Ticket prices are at record highs. Service fees are far from reduced. And Ticketmaster, part of the Live Nation empire, still tickets 80 of the top 100 arenas in the country. No other company has more than a handful. No competitor has risen to challenge its pre-eminence.

Now Department of Justice officials are looking into serious accusations about Live Nation's behavior in the marketplace.

They have been reviewing complaints that Live Nation, which manages 500 artists, including U2 and Miley Cyrus, has used its control over concert tours to pressure venues into contracting with its subsidiary, Ticketmaster. The company's chief competitor, AEG, has told the officials that venues it manages that serve Atlanta; Las Vegas; Minneapolis; Salt Lake City; Louisville, Ky.; and Oakland, Calif., were told they would lose valuable shows if Ticketmaster was not used as a vendor, a possible violation of antitrust law.

5.      On this news, Live Nation's stock price fell $3.97 per share, or almost 10%, to close at $38.17 per share on April 2, 2018, on unusually heavy volume. The following trading session, Live Nation stock continued its decline, dropping $1.56 per share, or over 4%, to close on April 3, 2018 at $36.61 per share.

6.    Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company failed to abide by the terms of the Consent Decree; (2) that the Company lacked adequate internal controls to prevent a violation of the Consent Decree; and (3) that, as a result of the foregoing, the Company's financial statements and Defendants' statements about Live Nation's business, operations, and prospects, were materially false and misleading at all relevant times.

7.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

10.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  A significant portion of Defendants' actions, and the subsequent damages, took place in this Judicial District.  Additionally, Live Nation's principal executive offices are located within this Judicial District.

11.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

# **PARTIES**

12.    Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Live Nation stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.    Defendant Live Nation is incorporated in Delaware and its principal executive offices are located in Beverly Hills, California.  Live Nation's common stock trades on the New York Stock Exchange (the "NYSE") under the symbol "LYV."

14.    Defendant Michael J. Rapino ("Rapino") was the President and Chief Executive Officer ("CEO") of Live Nation at all relevant times.

15.    Defendant Joe Berchtold ("Berchtold") was the President of Live Nation beginning on or around January 2018.

16.    Defendant Jared Smith ("Smith") was the President of Ticketmaster North America at all relevant times.

17.    Defendants Rapino, Berchtold, and Smith are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Live Nation's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements

pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

18.    Live Nation produces live concerts and sells tickets to those events over the internet, owning and operating over 195 venues throughout the world.

### Materially False and Misleading Statements Issued During the Class Period

19.    The Class Period begins on February 23, 2017, on that date the Company filed its annual report on Form 10-K for the period ended December 31, 2016. Therein, the Company stated that, "we believe that we are materially in compliance with [federal, state and local laws]…governing primary ticketing and ticket resale services."

20.    On February 23, 2017, the Company also published a press that provided in relevant part:

> Live Nation delivered its sixth consecutive year of record results across revenue, adjusted operating income, or AOI, and free cash flow, and also delivered operating income growth in 2016. For the year, revenue was up 15%, operating income was up 48%, and free cash flow was up 5%, all as reported, and AOI was up 12% at constant currency. Our core divisions - concerts, ticketing and advertising - each delivered their strongest operating income and AOI results in the history of the company.

> We continue to see the tremendous power of live events, with strong global consumer demand. Live is a truly unique entertainment form - it cannot be duplicated. It is elevated, not threatened, by technology and is borderless. Fans around the world can now discover, follow, share and embrace artists, creating greater demand for live shows. We believe the live business will continue to have strong growth for years to come as fans globally drive demand, artists are motivated to tour, and technology drives conversion.

21.     On May 4, 2017, Live Nation filed a quarterly report on Form 10-Q for the period ended March 31, 2017. And, on that same day the Company published a press release announcing financial results for the first quarter 2017, stating in relevant part:

**Highlights (year-over-year):**

Ÿ Revenue Up 17% for the Quarter to $1.4 Billion

Ÿ Operating Income Improves 36% for the Quarter to $(21) Million

Ÿ Adjusted Operating Income Up 25% for the Quarter to $92 Million

Ÿ Concert Ticket Sales for 2017 Shows of 46 Million, Up 25% through April

Ÿ Sponsorship & Advertising Contracted Net Revenue Up Double Digits through April

Ÿ Ticketmaster Fee-Bearing GTV at Constant Currency Up 18% through First Quarter

Live Nation has continued growing its business in 2017, with first quarter revenue up 17%, operating income improvement of 36%, and adjusted operating income, or AOI, up 25%, with strong operating performance across all our concerts, advertising and ticketing segments.

This year we have booked more shows, sold more tickets and have more sponsorship commitments than ever before at this point of the year. With the strength of these leading indicators, I am confident we will once again deliver record topline, operating income and AOI performance in each of our businesses in 2017.

The global concerts industry is structurally growing, with strong tailwinds for both supply and demand. On the supply side, artists are touring now more than ever. And on the demand side, between the millennial shifting of spend to experiences and the globalization of artists on social media, we see continued long-term growth as fans attend more concerts.

22.     On August 9, 2017, Live Nation filed a quarterly report on Form 10-Q for the period ended June 30, 2017. And, on that same day the Company published a press release announcing financial results for the second quarter 2017, stating in relevant part:

**Highlights (year-over-year):**

Ÿ Revenue Up 29% for the Quarter to $2.8 Billion

Ÿ Operating Income Up 53% for the Quarter to $113 Million

Ÿ Adjusted Operating Income Up 22% for the Quarter to $221 Million

Ÿ Net Cash Provided by Operating Activities Increased for the Quarter to $43 Million

Ÿ Free Cash Flow — Adjusted Up 42% for the Quarter to $154 Million

Ÿ Event-Related Deferred Revenue Up 31% to $1.5 Billion as of June 30

Ÿ Concert Tickets Sold for 2017 Shows are Over 68 Million, Up 22% through July
Ÿ Sponsorship & Advertising Contracted Net Revenue Up Double Digits through July

Ÿ Ticketmaster Fee-Bearing GTV at Constant Currency Up 13% through June

Live Nation continued growing its businesses in the second quarter, with revenue up 29%, operating income up 53% and adjusted operating income, or AOI, up 22%, while net cash provided by operating activities increased to $43 million, and free cash flow - adjusted increased to $154 million, up 42%. All three segments grew as we continued demonstrating the strength of our business model. Our concerts business is our flywheel, selling over 68 million tickets to shows this year through July, 12 million more tickets than at this point last year.

This demonstrates that we have built the industry's most scalable and unparalleled live platform, bringing over 550 million fans in 40 countries to live events each year. With key metrics in each of concerts, sponsorship and ticketing pacing double digits ahead of last year, we are confident that 2017 will be another record year of results for Live Nation.

23.     On November 2, 2017, Live Nation filed a quarterly report on Form 10-Q for the period ended September 30, 2017. And, on that same day the Company published a press release announcing financial results for the third quarter 2017, stating in relevant part:

**Highlights (year-over-year):**

Ÿ Event-Related Deferred Revenue Up 86% to $774 Million as of September 30

Ÿ Concert Tickets Sold for 2017 Shows Over 80 Million, Up 20% through October

Ÿ Sponsorship & Advertising Contracted Net Revenue Up 13% through October
Ÿ Ticketmaster Fee-Bearing GTV Up 14% through September

Ÿ Revenue Up 12% for the Quarter to $3.6 Billion

Ÿ Operating Income Up 5% for the Quarter to $201 Million

Ÿ Adjusted Operating Income Up 10% for the Quarter to $335 Million

Live Nation had its best third quarter ever and 2017 is on track to deliver another year of record results across revenue, operating income and adjusted operating income, or AOI. For the quarter, revenue was up 12%, operating income was up 5% and AOI was up 10%. For the nine months, revenue was up 19%, operating income was up 26% and AOI was up 16%. All our divisions — concerts, advertising and ticketing — each delivered their strongest quarterly AOI results ever.

Our concerts business is our flywheel, attracting almost 30 million fans to shows globally in the quarter, which then drove record results in our onsite, ticketing and advertising businesses. Through October, we have sold over 80 million tickets for concerts in 2017, up 20% year-on-year.

With our strength in concert attendance growth we are also seeing similar success in our onsite, sponsorship and ticketing businesses, giving us confidence that 2017 will be another year of record results for Live Nation overall and for each of our divisions.

24.     On February 27, 2018, Live Nation filed an annual report on Form 10-K for the period ended December 31, 2017. Therein, the Company stated that, "we believe that we are materially in compliance with [federal, state and local laws]… governing primary ticketing and ticket resale services."

25.     On February 27, 2018 the Company published a press release announcing financial results for 2017, stating in relevant part:

**Full Year 2017 - Another Record Year for Live Nation**

**Ÿ Revenue Up 24% to $10.3 Billion**

**Ÿ Live Nation Concerts Attendance of 86 Million, Up 21%**

**Ÿ Ticketmaster Fee-Bearing GTV Up 15% and Secondary GTV Up 16%**

**Ÿ Sponsorship & Advertising Revenue Up 18%**

**Ÿ Event-Related Deferred Revenue Up 13% to $816 Million as of December 31**

**2018 Indicators (as of Mid-February)**

**Ÿ Confirmed Concerts Show Count Up 7% Year-Over-Year**

**Ÿ On-Site Spending at Amphitheaters Expected to Grow Additional $2 Per Fan**

**Ÿ Sponsorship & Advertising Committed Net Revenue at 70% of 2018 Projections**

Live Nation delivered its seventh consecutive year of record results, with revenue growth across all our divisions - concerts, sponsorship

and ticketing. We continue to see the tremendous power of live events, with strong consumer demand and a robust supply of new and established artists hitting the road from clubs to stadiums. Live is truly a unique entertainment form; it cannot be duplicated and creates lifetime memories that fans are craving more than ever in this experience economy.

We believe the live business will continue to have strong growth for years to come as fans globally drive demand, artists are touring more, and sponsorship and ticketing benefit from the concerts flywheel.

26.     The above statements identified in ¶¶19-25 were materially false and/or misleading when made because Defendants failed to disclose: (1) that the Company failed to abide by the terms of the Consent Decree; (2) that the Company lacked adequate internal controls to prevent a violation of the Consent Decree; and (3) that, as a result of the foregoing, the Company's financial statements and Defendants' statements about Live Nation's business, operations, and prospects, were materially false and misleading at all relevant times.

**Disclosures at the End of the Class Period**

27.     On April 1, 2018, after the close of the market, The New York Times published a story entitled, "Roster of Stars Lets Live Nation Flex Ticket Muscles, Rivals Say." Therein, the article alleged that the Company failed to abide by the terms of a consent decree aimed to prevent Live Nation and Ticketmaster from monopolizing the market for live musical performances. The article stated in relevant part:

In 2010, when the Justice Department allowed the two most dominant companies in the live music business -- Live Nation and Ticketmaster -- to merge, many greeted the news with dread.

Live Nation was already the world's biggest concert promoter. Ticketmaster had for years been the leading ticket provider. Critics warned that the merger would create an industry monolith, one capable of crippling competitors in the ticketing business.

Federal officials tried to reassure the skeptics. They pointed to a consent decree, or legal settlement, they had negotiated as part of the merger approval. Its terms were strict, they said: It would boost competition and block monopolistic behavior by the new, larger Live Nation.

*** 

Ticket prices are at record highs. Service fees are far from reduced. And Ticketmaster, part of the Live Nation empire, still tickets 80 of the top 100 arenas in the country. No other company has more than a handful. No competitor has risen to challenge its pre-eminence.

Now Department of Justice officials are looking into serious accusations about Live Nation's behavior in the marketplace.

They have been reviewing complaints that Live Nation, which manages 500 artists, including U2 and Miley Cyrus, has used its control over concert tours to pressure venues into contracting with its subsidiary, Ticketmaster. The company's chief competitor, AEG, has told the officials that venues it manages that serve Atlanta; Las Vegas; Minneapolis; Salt Lake City; Louisville, Ky.; and Oakland, Calif., were told they would lose valuable shows if Ticketmaster was not used as a vendor, a possible violation of antitrust law.

28.     On this news, Live Nation's stock price fell $3.97 per share, or almost 10%, to close at $38.17 per share on April 2, 2018, on unusually heavy volume. The following trading session, Live Nation stock continued its decline, dropping $1.56 per share, or over 4%, to close on April 3, 2018 at $36.61 per share.

## CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Live Nation securities between February 23, 2017 and March 30, 2018, inclusive, seeking to pursue remedies under the Exchange Act; and who were damaged thereby (collectively, the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company,

at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

30.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Live Nation's securities were actively traded on the NYSE.   While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Millions of Live Nation shares were traded publicly during the Class Period on the NYSE.   As of February 20, 2018, there were 208,168,826 shares of the Company's common stock outstanding.   Record owners and other members of the Class may be identified from records maintained by Live Nation or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

31.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

32.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

33.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Live Nation ; and

(c)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

34.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

35.     The market for Live Nation's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Live Nation's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Live Nation's securities relying upon the integrity of the market price of the Company's securities and market information relating to Live Nation, and have been damaged thereby.

36.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Live Nation's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Live Nation's business, operations, and prospects as alleged herein.

37.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Live

Nation's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

38.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

39.    During the Class Period, Plaintiff and the Class purchased Live Nation's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

40.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Live Nation, his/her control over, and/or receipt and/or modification of Live Nation's allegedly materially misleading misstatements and/or their associations with the Company

which made them privy to confidential proprietary information concerning Live Nation, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

41.    The market for Live Nation's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Live Nation's securities traded at artificially inflated prices during the Class Period.  On February 26, 2018, the Company's stock closed at a Class Period high of $48.59 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Live Nation's securities and market information relating to Live Nation, and have been damaged thereby.

42.    During the Class Period, the artificial inflation of Live Nation's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Live Nation's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Live Nation and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

43.    At all relevant times, the market for Live Nation's securities was an efficient market for the following reasons, among others:

(a)     Live Nation stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Live Nation filed periodic public reports with the SEC and/or the NYSE;

(c)     Live Nation  regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Live Nation was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

44.   As a result of the foregoing, the market for Live Nation's securities promptly digested current information regarding Live Nation from all publicly available sources and reflected such information in Live Nation's stock price. Under these circumstances, all purchasers of Live Nation's securities during the Class Period suffered similar injury through their purchase of Live Nation's securities at artificially inflated prices and a presumption of reliance applies.

45.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material

in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

### NO SAFE HARBOR

46.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Live Nation  who knew that the statement was false when made.

### FIRST CLAIM
**Violation of Section 10(b) of The Exchange Act
and Rule 10b-5 Promulgated Thereunder
(Against the Company and the Individual Defendants)**

47.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

48.    During the Class Period, the Company and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other

1    members of the Class to purchase Live Nation's securities at artificially inflated
2    prices.  In furtherance of this unlawful scheme, plan and course of conduct, the
3    Company and the Individual Defendants, and each of them, took the actions set
4    forth herein.

5        49.    the Company and the Individual Defendants (i) employed devices,
6    schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or
7    omitted to state material facts necessary to make the statements not misleading; and
8    (iii) engaged in acts, practices, and a course of business which operated as a fraud
9    and deceit upon the purchasers of the Company's securities in an effort to maintain
10   artificially high market prices for Live Nation's securities in violation of Section
11   10(b) of the Exchange Act and Rule 10b-5.  The Company and the Individual
12   Defendants are sued either as primary participants in the wrongful and illegal
13   conduct charged herein or as controlling persons as alleged below.

14       50.    The Company and the Individual Defendants, individually and in
15   concert, directly and indirectly, by the use, means or instrumentalities of interstate
16   commerce and/or of the mails, engaged and participated in a continuous course of
17   conduct to conceal adverse material information about Live Nation's financial well-
18   being and prospects, as specified herein.

19       51.    These defendants employed devices, schemes and artifices to defraud,
20   while in possession of material adverse non-public information and engaged in acts,
21   practices, and a course of conduct as alleged herein in an effort to assure investors of
22   Live Nation's value and performance and continued substantial growth, which
23   included the making of, or the participation in the making of, untrue statements of
24   material facts and/or omitting to state material facts necessary in order to make the
25   statements made about Live Nation  and its business operations and future prospects
26   in light of the circumstances under which they were made, not misleading, as set
27   forth more particularly herein, and engaged in transactions, practices and a course of
28

business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

52.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

53.     The Company and the Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Live Nation's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by the Company and the Individual Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, these defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining

from taking those steps necessary to discover whether those statements were false or misleading.

54.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Live Nation's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Company and the Individual Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Company and the Individual Defendants, but not disclosed in public statements by these defendants during the Class Period, Plaintiff and the other members of the Class acquired Live Nation's securities during the Class Period at artificially high prices and were damaged thereby.

55.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Live Nation was experiencing, which were not disclosed by the Company and the Individual Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Live Nation  securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

56.    By virtue of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

57.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with

their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

58.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

59.     The Individual Defendants acted as controlling persons of Live Nation within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

60.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

61.     As set forth above, Live Nation and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual

Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Federal Rules of Civil Procedure 23;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 18, 2018            **GLANCY PRONGAY & MURRAY LLP**


By:  _s/ Robert V. Prongay_
Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email:  rprongay@glancylaw.com

- and -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**HOLZER & HOLZER LLC**
Corey D. Holzer
1200 Ashwood Parkway, Suite 410
Atlanta, Georgia  30338
Telephone: (770) 392-0090
Facsimile:  (770) 392-0029
Email: cholzer@holzerlaw.com

*Counsel for Plaintiff*

**CERTIFICATION OF NAMED PLAINTIFF**
**PURSUANT TO FEDERAL SECURITIES LAWS**

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows **- List additional transactions on Schedule A, if necessary**:

Purchases:

| Ticker of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| LYV | ███████ | ██ | ████ |
| | ███████ | ██ | ████ |
| | 2/6/2018 | 25 | 43.53 |

Sales: | 2/28/2018 | 25 | 45.01 |

| Ticker of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|
| LYV | | | |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

None

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___3___ day of __April__, 2018 in ___Las Vegas_____, ____Nevada_____.

                                                City                        State

(Signature) X_____Kathryn A Poser_____

                            09350A65064548F...

(Print Name)_____Kathryn A Poser_____

                        First                    Last

SCHEDULE A

Purchases:

| Ticker of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| LYV | 3/1/2018 | 45 | 43.06 |
| | 3/7/2018 | 30 | 43.76 |
| | 3/8/2018 | 25 | 44.00 |

Sales:

| Ticker of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|
| LYV | | | |